## COMMONWEALTH vs. STEVIE WALKER.

Suffolk. April 5, 2013. - August 12, 2013.

Present: IRELAND, C.J., CORDY, BOTSFORD, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Arraignment, Instructions to jury, Motion to suppress, Objections to jury instructions, Voluntariness of statement, Admissions and confessions, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Voluntariness of statement. *Waiver. Mental Impairment. Intoxication. Malice.*

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress evidence in which he claimed that, because of his impaired mental and physical condition, his waiver of his Miranda rights and his right to prompt arraignment were not knowing, intelligent, and voluntary, and his subsequent statements to police were not voluntary, where the judge properly considered all factors relevant to the totality of the circumstances, and the evidence supported the judge's conclusions that the defendant was not impaired by alcohol or drugs at the time he waived his rights and spoke to police and that the length of the interview and his physical condition did not overcome his will [273-278]; further, suppression was not required by the failure of police to inform the defendant of his right to make a telephone call upon his arrest, in violation of G. L. c. 276, 33A, where the record supported the judge's conclusion that the deprivation was not intentional [278-279].

At the trial of an indictment charging murder in the first degree, no prejudice arose from the judge's misstatement in her instructions to the jury, where the error was no more than a slip of the tongue [282-284]; further, there was no error in the judge's instructions on mental impairment and the voluntary consumption of drugs, as relating to a murder committed with extreme atrocity or cruelty [284-285].

INDICTMENT found and returned in the Superior Court Department on December 29, 2005.

A pretrial motion to suppress evidence was heard by *Frank M. Gaziano*, J.; the case was tried before *Christine M. McEvoy*, J.

*Elaine Pourinski* for the defendant.

*Sarah H. Montgomery*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On December 19, 2007, a jury convicted the defendant, Stevie Walker, of murder in the first degree on a theory of extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues error in the denial of his motion to suppress statements and the instructions to the jury. We affirm the order denying his suppression motion and affirm his conviction. We discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Motion to suppress.* a. *Standard of review and background.* Prior to trial, the defendant moved to suppress statements he made on November 6, 2005, to police on his arrival at a Boston police station as well as during a tape recorded interview with homicide detectives shortly thereafter, claiming that all of his statements were obtained in violation of various State and Federal constitutional rights. Specifically, as relevant here, the defendant argued that he had not knowingly, willingly, and intelligently waived his Miranda rights; his statements were not voluntarily made due to his impaired physical and mental condition; he did not knowingly, willingly, and intelligently waive his right to a prompt arraignment pursuant to *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (*Rosario*);[2] and police intentionally violated his right pursuant to G. L. c. 276, § 33A, to make a telephone call. After conducting an evidentiary hearing, the motion judge, who was not the trial judge, rejected the defendant's arguments and denied his motion with one exception not relevant here.[3] "In reviewing a [decision] on a motion to suppress, we

---

[1]The Commonwealth also had proceeded under a theory of deliberate premeditation, but the jury did not find the defendant guilty under that theory.

[2]In *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (*Rosario*), the court held that an "otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written . . . waiver of his right to be arraigned without unreasonable delay." See Mass. R. Crim. P. 7 (a) (1), as appearing in 442 Mass. 1506 (2004) ("A defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session").

[3]When the defendant arrived at the police station and told police that he was there to "turn [himself] in," one officer asked the defendant, "O.K., you know what you did, right?" to which the defendant replied, "Yeah." The judge allowed the defendant's motion to suppress this question and answer because the question was not preceded by Miranda warnings and was designed

accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002).

We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing that was implicitly credited by the judge. See *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337 (2007), and cases cited. On November 4, 2005, at approximately 3:10 P.M., Boston police Detectives William E. Doogan and Brian Black responded to the report of a fatal stabbing. In the victim's apartment, police observed reddish-brown stains on a living room carpet, in the foyer, on a bathroom door, and in a bedroom. They saw a "dread-lock" of human hair on the foyer floor. A witness informed them that the assailant had fled the building.

Further investigation indicated that the defendant, who wore his hair in dreadlocks, had completed the sign-in sheet and entered the building that day to visit a female friend, Phyllis Calvey, who lived in an apartment below the victim's. The defendant was with Calvey on Thursday, November 3, 2005. On that day, with Calvey and another individual, the defendant smoked "crack" cocaine in Calvey's apartment. That night, the group heard noises coming from an apartment upstairs. Calvey commented that a "retarded person" lived above her. The next morning, the group smoked more crack cocaine then returned to bed. Calvey woke the defendant up at approximately 1:45 P.M. Although the defendant was tired, he did not appear to be intoxicated or impaired. He left the apartment twenty minutes later. About fifteen minutes after he had departed, Calvey heard noises from the upstairs apartment. The defendant was expected to return to Calvey's apartment, but he never did. Based in part on some of this information, the police focused on the defendant as a suspect. A flyer naming the defendant as a suspect subsequently was distributed to police in the area of the District 4 or "D-4" police station.

On Sunday, November 6, at approximately 5 A.M., the defend-

to elicit an incriminating response. Because there is no contention on appeal concerning this ruling, we need not address it.

ant entered the lobby of the D-4 police station and sat down on a bench. Officer Daryl Vinson recognized the defendant from the flyer and indicated as such to Officer Scott Yanovitch. Officer Yanovitch looked over and noticed that the defendant was sleeping. Officer Yanovitch observed reddish-brown stains on the defendant's pants. Officer Yanovitch, followed by Officer Christopher Broderick, went over to the defendant and asked him, "What's up?" The defendant opened his eyes and replied that he was there to "turn [himself] in." Officer Yanovitch replied, "O.K., you know what you did, right?" The defendant responded, "Yeah."[4]

Because the defendant's hands were underneath a newspaper, Officer Yanovitch asked him to show his hands. The defendant complied; there appeared to be blood on his hands, and he held an empty candy wrapper. Officer Yanovitch informed the defendant that he would be placing him in handcuffs. As he did, at approximately 5:05 A.M., Officer Yanovitch verbally recited the Miranda warnings to the defendant from memory.[5] When asked whether he understood these warnings, the defendant responded affirmatively.[6] Officer Broderick asked the defendant whether he had been drinking or using drugs. The defendant replied, "Not in a while." Officer Broderick then ascertained that the defendant had completed eleven years of schooling.

The officers escorted the defendant to the booking area, where he fully cooperated with them. They did not observe any evidence that the defendant was impaired in any way. Officer Yanovitch asked the defendant where he had been during the past few days. The defendant stated he had been inside a garage. The defendant was placed in a holding cell to await the arrival of homicide detectives.

---

[4]As previously noted, this question and answer were suppressed.

[5]Officer Yanovitch advised the defendant that he had the right to remain silent, the right to refuse to answer questions that may incriminate him, the right to have an attorney present for questioning, and the right to have counsel appointed if he could not afford an attorney. Officer Yanovitch did not inform the defendant of the so-called fifth Miranda warning, the right to stop questioning at any time, and was not required to do so. See Commonwealth v. Silanskas, 433 Mass. 678, 688 n.11 (2001).

[6]The defendant had past involvement in the criminal justice system and previously had been informed of his Miranda rights.

Detective Doogan arrived at the police station at approximately 7 A.M. The defendant was sleeping inside the holding cell. Detective Black and Sergeant Detective Harold White arrived a short time later. They decided to interview the defendant at police headquarters and had him transported there.

A uniformed police officer brought the defendant into the homicide unit's interview room, where Detectives Doogan and Black were waiting. The defendant had no trouble walking into the room. His handcuffs were removed, and he sat down at a table with the detectives. He did not appear to them to be under the influence of alcohol or drugs. He was cooperative and calm.

Detective Doogan began the interview at approximately 8:45 A.M., by informing the defendant that they had to "go over" some matters. The defendant responded affirmatively that he understood. Using a preprinted form that was placed where both he and the defendant could see it, Detective Black read to the defendant the Miranda warnings verbatim from the form. After each warning, Detective Black stopped and asked the defendant whether he understood the individual warning. The defendant responded that he understood and initialed the appropriate line next to each warning. Detective Black asked the defendant whether he was willing to waive his rights and make a statement without a lawyer being present. The defendant printed his name on the form on a blank space and agreed to waive his rights. The defendant signed the form and Detective Doogan also signed it as a witness. The defendant then agreed to have the interview electronically recorded and signed a consent form to that effect.

The detectives tape recorded the entire interview, beginning with a recital of the Miranda warnings from the preprinted form for a second time. Detective Black asked the defendant whether he understood the warnings and the defendant answered affirmatively. At approximately 10:50 A.M., Detective Doogan interrupted the interview by presenting the defendant with a form regarding the waiver of his right to a prompt arraignment. Detective Doogan explained that he was required to inform a suspect of these rights after the expiration of a certain amount of time. Detective Doogan read the form aloud while the defendant read along. The defendant hesitated for a moment before

signing the form, asking whether he had injured Calvey. Detective Doogan assured the defendant that Calvey was not injured. The defendant signed the form waiving his right to a prompt arraignment prior to the expiration of the six-hour safe harbor time period. The interview resumed and ended at 1 P.M.

During the interview, the defendant did not confess to stabbing the victim. He stated that, earlier that morning, he awoke inside a locked storage room in a hotel parking garage. He had to break out by kicking a metal screen. He went to the police station to find out whether something had happened because there was "blood all over [him]." He admitted to visiting Calvey "a few days ago." He informed the detectives that he had a "rock" cocaine habit and that, a "few days ago," he had smoked cocaine with Calvey. He had no memory of any events occurring in between smoking the cocaine and waking up in the storage room.

Toward the beginning of the interview, the defendant told the detectives that he was hungry. They offered him water, which he declined, and later a sports drink. About one and one-half hours into the interview, they offered him some snacks, and the defendant ate some of them. When he requested a sandwich, the detectives ordered one and encouraged him to eat in front of them. The defendant ate but did not devour the sandwich. During the interview, the defendant complained that his hand hurt. He had a visible cut on the knuckle of his middle finger of his left hand. One of the detectives asked whether the defendant needed immediate medical attention, offering to get an emergency medical technician. The defendant declined treatment for the small cut.

A few times during the questioning, the defendant said he was tired and closed his eyes before answering questions. The detectives told him to open his eyes and tried to have him focus on the question.

After the interview, the detectives brought the defendant to an area where he and his clothing were photographed. The defendant then was transported back to the D-4 station where he was booked at 3:13 P.M. After booking, the defendant was informed that he could make a telephone call, but he declined to do so.

b. *Discussion.* i. *Waiver of Miranda rights.* The defendant

argues that he did not make a voluntary, knowing, and intelligent waiver of his Miranda rights because of his "debilitated state." "Because the defendant was advised of, and waived, his Miranda rights, the issue becomes whether the Commonwealth has proved [beyond a reasonable doubt] . . . that the defendant made a voluntary, knowing, and intelligent waiver of his rights, and that his statements were otherwise voluntary," based on the totality of the circumstances. *Commonwealth* v. *LeBeau*, 451 Mass. 244, 254-255 (2008), and cases cited. See *Commonwealth* v. *Bins*, 465 Mass. 348, 355 (2013) (Commonwealth must prove waiver and voluntariness of statement beyond a reasonable doubt); *Commonwealth* v. *Medeiros*, 395 Mass. 336, 343 (1985) (although voluntariness of Miranda waiver and voluntariness of statement are distinct inquiries, each analysis involves totality of circumstances test). In making these determinations, courts examine factors such as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency . . . and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Tolan*, 453 Mass. 634, 642 (2009), quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

The various facts that the defendant argues rendered the waiver of his Miranda rights involuntary do not require that conclusion. The judge's findings, which have an evidentiary basis in the record, support his conclusion that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights.

Contrary to the defendant's suggestion, the judge properly considered the defendant's age, education, work experience, and prior experience in the criminal justice system, and the weight of that evidence was for him to decide. See *Commonwealth* v. *Mandile*, *supra* (in deciding voluntariness of Miranda waiver and voluntariness of statements, courts examine factors including "defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system"). See also *E.C.O.* v. *Compton*, 464 Mass. 558, 562 (2013) (deferring credibility determinations to motion judge who heard

evidence). The judge also fully took into account the defendant's "debilitated state." Although a defendant's intoxication (by means of alcohol or drugs) bears on whether his statements were voluntarily made, see *Commonwealth* v. *Taylor*, 398 Mass. 725, 728-729 (1986), the defendant overlooks that the judge expressly discredited his claim that, at the time he arrived at the police station on the morning of November 6, he was impaired by drugs or alcohol. The record supports the judge's conclusion. The evidence showed that prior to arriving at the police station, the defendant had last consumed alcohol or smoked crack cocaine during the morning of Friday, November 4. When the defendant left Calvey's apartment sometime after 2 P.M. that day, he appeared to be unimpaired. Further, during his time at the police station on November 6, the defendant did not demonstrate any signs of being under the influence of alcohol or drugs. See *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001) (waiver of Miranda rights valid where judge found no credible evidence that defendant was under influence of alcohol or drugs at time he made statement); *Commonwealth* v. *Doucette*, 391 Mass. 443, 448-450 (1984) (waiver of Miranda rights valid and confession voluntary where, despite evidence of prior consumption of alcohol, other evidence found credible by judge showed that at time of waiver and statements, defendant's will not overcome by intoxication).

The judge addressed the defendant's contentions that the defendant was hungry and tired, and properly concluded, based on his review of the recording and other record evidence he credited, that these factors did not require a determination that the defendant's will was overborne. Concerning the defendant's hunger, the judge based his conclusion on evidence showing that the defendant had been offered some food by the detectives and was selective in what he ate, not consuming it all. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 115 (1999) (defendant's claim that waiver of Miranda rights was invalid based in part on extreme hunger undermined by fact that he did not finish food given to him). In addition, the judge credited evidence that the defendant had slept in Calvey's apartment on the morning of November 4, thereafter slept at various times in the garage storage unit, and had slept in the holding cell at the D-4

police station after his arrival there on November 6. Of significance to the judge was the fact that, although during the interview the defendant had closed his eyes at certain instances, that action was momentary in the context of the entire interview and, overall, the defendant was responsive to questioning and was coherent. See *Commonwealth* v. *Morales*, 461 Mass. 765, 777-778 (2012) (record supported judge's finding that, although defendant was tired, it did not render his will overborne when he made his statements).

Further, the length of the interview did not render the defendant's Miranda waiver involuntary. See *Commonwealth* v. *McCowen*, 458 Mass. 461, 472 (2010) ("Although the six-hour period over which the interview unfolded was lengthy, there is nothing in the judge's findings or our own independent review of the record to suggest that the defendant's will was overborne to the extent that his statement was not the result of his free and voluntary act"); *Commonwealth* v. *Durand*, 457 Mass. 574, 596-597 (2010) (despite six-hour interview and use of improper interrogation tactics, defendant's statements were voluntary where "the totality of circumstances demonstrate[d] that the defendant's will was not overborne").

The defendant suggests that his confusion rendered his Miranda waiver invalid, and that he never unequivocally agreed to make a statement. The defendant isolates two remarks, made together after Detective Black repeated the Miranda warnings to him a second time, namely, his statements that "[maybe he would] make a statement," and that he did not know what was happening. Although the judge did not specifically address these isolated remarks, he reviewed the tape recording and concluded that there was nothing about the nature of the interview or the manner in which it was conducted to suggest that the defendant's will was overcome. The judge expressly found the defendant to be "aware of his predicament and his surroundings, capable of following the questions, and able to understand the choices he faced." The record demonstrates that the judge permissibly viewed the defendant's remarks in the context of the totality of the circumstances, and the judge's findings and conclusions are supported by the record.

ii. *Voluntariness of statements.* "Due process requires a

separate inquiry into the voluntariness of [a defendant's] statement, apart from the validity of the Miranda waiver." *Commonwealth* v. *Magee*, 423 Mass. 381, 387 (1996), and cases cited. This determination involves an examination of the totality of the circumstances surrounding the making of the statement to make sure that the defendant's statement was a free and voluntary act and was not the result of inquisitorial activity that had overborne his will. *Id.* "Relevant factors include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995), quoting *Commonwealth* v. *Mandile, supra.* The burden is on the Commonwealth to prove voluntariness beyond a reasonable doubt. *Commonwealth* v. *Edwards*, 420 Mass. 666, 669 (1995).

In contending that his statements were not voluntarily made, the defendant relies on the same arguments he presented in connection with the claim that he did not voluntarily waive his Miranda rights. In making his determination on voluntariness, the judge similarly relied on the factors he used in assessing the validity of the defendant's waiver of his Miranda rights. The judge also was influenced by the fact that, although the defendant had scratches on his hands and arms, and blood on his clothing, he nonetheless was able to provide the detectives with a self-serving version of the facts, including a lack of memory of what had occurred after he left Calvey's apartment and before he woke up in the storage room. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 (1982) (defendant's efforts to offer exculpatory facts support finding of awareness that statement could have adverse consequences). The judge's findings, which have an evidentiary basis in the record, support his conclusion that the defendant's statements were voluntarily made and we see no basis to disturb this ruling.[7]

iii. *Delay between arrest and arraignment.* We reject the

---

[7]The trial judge gave the jury humane practice instructions in his final charge.

defendant's argument that his statements to police should have been suppressed because his written waiver of his right to a prompt arraignment pursuant to *Rosario* was not voluntarily made. In support of his argument, he relies on the same reasons he claimed that his *Miranda* waiver was not valid and his statements were not voluntarily made. Because we reject these arguments, his contention made pursuant to the *Rosario* rule similarly fails. We add that it was the defendant who initiated discussion about his concern over Calvey and that the detectives truthfully answered his questions. The detectives' conduct "[did] not evince any measure of the principal mischief that the *Rosario* rule was adopted to prevent, namely, the coercive influence of intentional delays of arraignment to prolong custodial interrogation of unwilling and uncounseled arrestees." *Commonwealth v. Siny Van Tran*, 460 Mass. 535, 563 (2011).

iv. *Right to a telephone call.* There is no dispute that in violation of his statutory right, the defendant was not informed of his right to make a telephone call, see G. L. c. 276, § 33A,[8] until he was booked at 3:13 P.M. Only an intentional violation of the statute requires suppression of evidence, see *Commonwealth v. Johnson*, 422 Mass. 420, 429 (1996), and the defendant bears the burden of establishing an intentional violation, see *Commonwealth v. Leahy*, 445 Mass. 481, 489 (2005). Contrary to the defendant's contention, the record supports the judge's conclusion that the deprivation was unintentional. The defendant had been informed of his *Miranda* rights immediately after his arrest and prior to the interview with the detectives. The detectives advised the defendant of his right to have the interview electronically recorded and of his right to a prompt arraignment. The judge's reliance on the fact that the detectives informed the defendant of these other rights is not misplaced, nor was the judge's consideration of the defendant's prior experience in the

---

[8]General Laws c. 276, § 33A, provides: "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

criminal justice system. See *Commonwealth* v. *Rodriguez*, 58 Mass. App. Ct. 610, 622 (2003).

2. *Facts at trial.* Based on the Commonwealth's evidence, the jury could have found the following. During the early afternoon of Thursday, November 3, 2005, the defendant visited Calvey, who lived in an apartment building in Boston that housed elderly and disabled persons.[9] Calvey, who was living in apartment 506, was in her early sixties and had suffered three strokes. She wanted the defendant to braid her hair "like his."[10]

In the late afternoon, Calvey and the defendant left the apartment to purchase hair products. By the time they returned, approximately one to two hours later, John Belcher, who had been living with Calvey, had arrived at the apartment. The three relaxed and watched television until approximately 10 P.M., at which time the defendant and Belcher left to purchase beer with money loaned to the defendant by Calvey.[11] The defendant and Belcher returned within the hour and drank their beers. Shortly thereafter, they, together with Calvey, smoked crack cocaine.[12] Eventually, the defendant started working on Calvey's hair, finishing at approximately 2 A.M., now November 4. Shortly thereafter, Calvey went to her bedroom to sleep.

At approximately 5 A.M., Calvey was awakened by a telephone call from a drug dealer known as "Dread." Dread arrived at

[9]Earlier that morning, the defendant got into a brief altercation with his manager at a temporary employment agency. The defendant became "agitated," which was "out of character" for him, because it took too long for the manager to give him his daily assignment. The manager, consequently, asked the defendant to leave.

[10]The defendant's hair was braided in "dreadlocks."

[11]The defendant told Calvey he would pay her back the next day after he could pick up a check and cash it.

[12]Calvey's and Belcher's testimony differed concerning the amount of "crack" cocaine that was purchased and smoked. Calvey testified that, on Thursday night, she, Belcher, and the defendant had only smoked a "forty," or forty dollars' worth of crack cocaine. Belcher claimed that they had smoked at least one-hundred dollars' worth of crack cocaine and that there had been multiple purchases that night and multiple instances where they all had smoked the crack cocaine. Belcher also testified that immediately after smoking the crack cocaine, the defendant would become "a little bit agitated," but then would "relax." Calvey did not notice any agitation on the part of the defendant after he smoked the crack cocaine and testified that, in her opinion, he appeared "normal."

Calvey's apartment at 6 A.M. Seeking to purchase crack cocaine from Dread, Belcher gave forty dollars to Calvey, who gave the money to Dread[13] in exchange for a "forty." Calvey smoked some extra crack cocaine that she received from Dread in her bedroom, while Belcher, Dread, and the defendant remained in the living room. During this time, the defendant and Belcher smoked some of the crack cocaine that Calvey had just purchased. At some point, banging noises appeared to come from the apartment above, to which Calvey remarked that it was noise from the "retarded" person upstairs and "don't pay it no mind."[14] Before Calvey returned to sleep, the defendant asked whether she could wake him up at approximately 1:30 P.M. so that he could go get a paycheck. Calvey agreed to do so and went back to sleep at about 7:30 A.M.

When Calvey woke up at approximately 12:30 P.M., she roused the defendant, who had been sleeping on a small couch in the living room. The defendant smoked a small piece of crack cocaine and then freshened up in the bathroom. Before leaving, he asked Calvey for some money for bus fare so he could go pick up his check. Calvey gave him two dollars, and informed him that she would be keeping his wallet as collateral. The defendant gave Calvey his wallet and told her that he would return. On his way out, he asked Dread if he would still be there when he came back, to which Dread replied that he did not know. The defendant left at about 2 or 3 P.M.

At approximately 3 P.M., two sixth-floor residents heard screaming and pleas for help coming from the victim's apartment.[15] They tried to open the door, but it was locked. One of the residents went downstairs to alert the building manager. The building manager rushed to the sixth floor and unlocked the door to the victim's apartment. She, along with some of the other neighboring residents, went inside.

The building manager saw a man, whom she recognized immediately as Calvey's friend (the defendant), in the bathroom. After briefly making eye contact with the building manager, the

---

[13]Dread refused to deal directly with Belcher and the defendant.

[14]Unbeknownst to Calvey, the tenant to whom she was referring had moved out, and the victim had moved in.

[15]The victim was sixty-five years of age.

defendant tried to close the bathroom door. The building manager pushed against the door to prevent the defendant from locking himself in. She grabbed the defendant by the hood of his sweatshirt and pulled him out of the bathroom. The two struggled for a while, and eventually fell over, at which point the building manager yelled for someone to get security. When they got up, the defendant wrestled out of her grip and fled to an emergency exit. The building manager gave chase, hurrying down the stairs after him. She heard the defendant leave the building, and lost sight of him when she got outside.

The building manager returned to apartment 606, where the victim was lying on her back on the floor between the kitchen and the living room. Her eyes and mouth were open, her chest was covered with a small rug, and a large kitchen knife was protruding from her neck. An emergency medical technician tending to the victim felt a "very weak and erratic pulse." The victim was transported to a nearby hospital, where she was pronounced dead.

The building manager went to see Calvey. She asked for the name of Calvey's friend "with the dreads." Calvey gave her the name "Stevie," but did not recall his last name. Calvey handed the building manager the license and social security card from the defendant's wallet. The building manager recognized the man depicted on the defendant's license as the man in the victim's apartment with whom she had fought.[16] She returned upstairs, and gave the license and social security card to a police officer who had arrived, telling him, "This is the man [who] was in the [victim's] apartment."

The defendant fled to a storage closet at a nearby hotel parking garage and accidentally was locked inside. Two days later, at 5 A.M. on Sunday, November 6, the defendant broke out of the storage closet and went to the lobby of the D-4 police station to turn himself in. The evidence at trial concerning the circumstances surrounding, and content of, his statements to police was substantially similar to the facts established at the motion to suppress hearing and included admission of the recording of the defendant's interview.

---

[16]At trial, the building manager made an in-court identification of the defendant as the man she saw inside the victim's apartment.

Further evidence at trial included the testimony of the medical examiner who performed the victim's autopsy. The victim suffered numerous stab and incise wounds. She also had three contusions on her jaw, one on her elbow, and one on her knee, as well as defensive wounds to her hands. The victim died as a result of stab wounds to the neck and back, with perforations of the carotid artery and lungs.

The parties agreed to a stipulation that was admitted in evidence that deoxyribonucleic acid (DNA) testing revealed that DNA from a blood stain obtained from the defendant's T-shirt matched the victim's DNA. Also, the stipulation informed the jury that DNA from a blood stain on a curtain in the victim's bedroom and from a dreadlock recovered in her apartment matched the defendant's DNA.

The defendant did not testify. His trial counsel did not deny the fact that the defendant had stabbed the victim and caused her death. Rather, counsel argued that, when he did so, the defendant lacked the capacity to act with the criminal intent necessary for murder because of an underlying mental condition and due to a possible reaction to his crack cocaine use. In support of these contentions, the defendant presented two expert witnesses: Dr. Charles F. Carroll, a licensed psychologist who evaluated the defendant to determine whether he was competent to stand trial, and Dr. Montgomery C. Brower, a forensic psychologist hired by the defense to evaluate the defendant. Both witnesses diagnosed the defendant with having a personality disorder, not otherwise specified, with paranoid and schizoid or schiz-atypical traits.[17] Brower also diagnosed the defendant with cocaine dependence. He testified that the defendant's personality disorder could result in "social and interpersonal problems" for the defendant.

a. *Jury instructions.* In her main charge, after explaining the elements of murder in the first degree committed by deliberate premeditation and with extreme atrocity or cruelty, the judge instructed the jury to consider any credible evidence of the

---

[17]The defendant's two expert witnesses made clear that he did not meet the criteria for having either a paranoid or schizoid personality disorder or "severe mental illness"; rather, he only exhibited paranoid and schizoid features or traits.

defendant's mental impairment and the effect on the defendant of his voluntary consumption of drugs as such evidence related to intent and knowledge and in determining whether the Commonwealth had proved beyond a reasonable doubt that the defendant deliberately premeditated and acted in a cruel or atrocious manner. Specifically, in addition to instructing the jury on the effect of evidence of the defendant's mental impairment and voluntary consumption of drugs as it bore on the malice requirement for murder committed with extreme atrocity or cruelty, the judge instructed: "You may consider any credible evidence of mental impairment or voluntary consumption of drugs and/or whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased. That goes again to extreme atrocity or cruelty." During this time, a cellular telephone sounded, so the judge, at the request of counsel at the end of the charge, repeated that portion of the charge. In so doing, she specifically instructed the jury that they could consider any credible evidence of the defendant's mental impairment and the effect on the defendant of his voluntary consumption of drugs in determining "whether the government [had] proven beyond a reasonable doubt whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased." Subsequently, during deliberations, in response to various questions of the jury, including one on the issue of intent with regard to a murder committed with extreme atrocity or cruelty, the judge reinstructed the jury on the issue of mental impairment and the voluntary consumption of drugs, emphasizing that such evidence may be considered not only in connection with "the full-blown malice definition that applies to extreme atrocity [or] cruelty," but also as it applies to "whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased." The defendant objected to these instructions, informing the judge of his concern that these instructions did not adequately address the issue of mental impairment and voluntary consumption of drugs as bearing on the factors enunciated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (*Cunneen*). The defendant maintains on appeal that the instructions were "inadequate as [they] related to the *Cunneen* factors and could be understood as only pertaining to the malice requirement."

We review to determine whether there was error and, if so, whether the error prejudiced the defendant. See *Commonwealth* v. *Williams*, 439 Mass. 678, 682 (2003). When evaluating jury instructions, "we consider the charge in its entirety, to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function.' " *Commonwealth* v. *Batchelder*, 407 Mass. 752, 759 (1990), quoting *Commonwealth* v. *Richards*, 384 Mass. 396, 399-400 (1981). "Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error." *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993). "A judge is not required to give jury instructions in the exact manner requested by the defendant provided that the requested instruction is adequately covered." *Id.*

In her initial charge, in stating: "You may consider any credible evidence of mental impairment or voluntary consumption of drugs and/or whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased," the judge should not have used the words "and/or." In the context of the entirety of her instructions, however, no reasonable juror could have used the instruction incorrectly because she did not repeat this language in her reinstruction or in response to the jury's question concerning the issue of intent under the theory of extreme atrocity or cruelty. The error was no more than an isolated slip of the tongue and did not prejudice the defendant.

Turning to the issue of the relevance of evidence of the defendant's mental impairment or voluntary consumption of drugs, as those factors bore on murder committed with extreme atrocity or cruelty, the judge instructed the jury (with the one exception above noted) in conformity with our Model Jury Instructions on Homicide 62 (1999). We disagree that the judge's instructions on mental impairment and the voluntary consumption of drugs, as relating to murder committed with extreme atrocity or cruelty, only could have been construed as applying to the malice requirement. The judge's reinstructions, in particular, emphasized that such evidence could be considered not only in connection with "the full-blown malice definition," but also in connection with "whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased." We previously rejected

a similar argument involving almost identical instructions. See *Commonwealth* v. *Szlachta*, 463 Mass. 37, 45-46, 49 (2012) (rejecting defendant's argument that instructions should have directed jury to consider evidence of defendant's mental impairment, specifically in relation to all factors relevant to determining whether Commonwealth had proved extreme atrocity or cruelty [*Cunneen* factors]). There was no error.[18]

3. *Relief pursuant to G. L. c. 278, § 33E.* We have examined the record pursuant to G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgments affirmed.*

---

[18]Our revised Model Jury Instructions on Homicide (2013) obviate the issue raised by the defendant, addressing the relevance of evidence of a defendant's mental impairment and voluntary consumption of alcohol or drugs immediately after both the element of the intent required for murder committed with extreme atrocity or cruelty and the element that the killing was committed with extreme atrocity or cruelty. See *id.* at 45-49. We recommend the use of these instructions henceforth.