NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-63                                            Appeals Court

COMMONWEALTH  vs.  TRAVIS CURRY.

No. 14-P-63.

Suffolk.     March 6, 2015. - August 14, 2015.

Present:  Grainger, Meade, & Fecteau, JJ.


Controlled Substances.  Constitutional Law, Conduct of
     government agents, Fair trial.  Due Process of Law, Fair
     trial.  Practice, Criminal, Conduct of government agents,
     Loss of evidence by prosecution, Instructions to jury.
     Fair Trial.  Evidence, Certificate of drug analysis,
     Scientific test, Chain of custody.



     Indictments found and returned in the Superior Court
Department on April 20, 2011.

     The cases were tried before Patrick F. Brady, J.


     Jacob B. Stone for the defendant.
     Vincent J. DeMore, Assistant District Attorney, for the
Commonwealth.


     GRAINGER, J.  The defendant appeals from his convictions of

unlawful distribution of heroin in violation of G. L. c. 94C,

§ 32, and possession with the intent to distribute heroin in

violation of G. L. c. 94C, § 32A.[1]  He asserts that misconduct at

the William A. Hinton State Laboratory Institute forensic drug

laboratory (Hinton drug lab) deprived him of his due process

right to a fair trial and requests that we reverse his

convictions and dismiss the indictments with prejudice.  We

affirm.

Background.  We recite the facts as the jury could have

found them.  On February 9, 2011, Boston police arrested the

defendant after an undercover officer purchased two bags of

heroin for sixty dollars from the defendant at his home.  The

defendant was arrested in shorts, a T-shirt, and sandals.  A

search of his person uncovered an additional bag of heroin.  At

the time of the defendant's arrest, officers asked the

defendant's mother to bring him additional clothing.  The mother

complied, bringing the defendant a pair of jeans and a

sweatshirt, which the defendant later identified as belonging to

him.  Before allowing the defendant to wear the clothes,

officers searched the pockets for any potential weapons.  The

search of his pants revealed an additional fifteen bags of

---

[1] The defendant was sentenced to concurrent sentences of two years to two years and one day in State prison.  The defendant was also charged as a subsequent offender and with drug violations in a school zone in connection with each of these charges, all of which were later dismissed by the Commonwealth. The defendant was charged with, and acquitted of, possession with intent to distribute cocaine and a related school zone drug violation.

heroin, nine bags of "crack" cocaine, a knife, and six dollars. The defendant denied any knowledge of the drugs found in his pants.

All of the drug evidence was marked, turned over to the evidence officer, and transmitted to the Hinton drug lab. The substances were tested in April, 2011, by Annie Dookhan,[2] serving as the primary chemist, and thereafter by a secondary chemist, identified as heroin and cocaine, and returned to the Boston police pending trial. The misconduct at the Hinton drug lab was discovered in June, 2011, and the lab was closed in August, 2012. Before the lab was closed, but after Dookhan's misconduct surfaced, the drugs in this case were tested before trial by another chemist, Della Saunders. That testing in May, 2012, also identified the substances as heroin and cocaine.

The Commonwealth provided the defendant with all appropriate discovery, including that relating to the misconduct at the Hinton drug lab. That subject was fully explored at trial and, indeed, was central to the defense strategy.

Discussion. The defendant has asserted numerous claims on appeal, all of which are variations on the argument that the Commonwealth did not satisfy its burden, substantively or

---

[2] For a detailed discussion of Dookhan's misconduct and the investigation into the Hinton drug lab, see Commonwealth v. Scott, 467 Mass. 336, 337-342, 349-350 (2014).

procedurally, to prove that substances seized from him were illegal drugs.

1. Due process. The defendant asserts that the government's misconduct at the Hinton drug lab deprived him of his due process right to a fair trial. As this claim was not raised below, we review for a substantial risk of a miscarriage of justice. Commonwealth v. Monteagudo, 427 Mass. 484, 487 (1998). The precise issue raised here, involving a defendant whose trial was conducted after the discovery of Dookhan's misconduct, appears to be one of first impression. However, we are guided by the Supreme Judicial Court's decision in Commonwealth v. Scott, 467 Mass. 336 (2014) (Scott).

Scott dealt with the appropriate remedy for defendants who wished to withdraw their guilty pleas to drug charges in cases where Dookhan was either the primary or secondary chemist and her misconduct was unknown at the time of the plea. The court held that because the defendant in that case had entered a guilty plea[3] without knowledge of Dookhan's misconduct and could show that Dookhan was one of the chemists assigned to his case, the defendant was entitled to a presumption of government misconduct in the consideration of his motion to withdraw the

---

[3] "A motion to withdraw a guilty plea is treated as a motion for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001)." Commonwealth v. Furr, 454 Mass. 101, 106 (2009).

plea. That presumption would not, however, result in the withdrawal of a guilty plea unless the defendant could also demonstrate that he would not have pleaded guilty had he known of the misconduct. Scott, 467 Mass. at 344-355. The court specifically limited the favorable presumption to the context of a motion for a new trial: "[T]his presumption shall not apply in a trial in which the defendant seeks to impeach the testing process utilized at the Hinton Drug lab, including those new trials conducted following the grant of a defendant's motion to withdraw a guilty plea pursuant to our holding in this case." Id. at 354.

In the context of this case, the import of Scott is that a defendant who elects a trial will have the opportunity to present evidence, but not the benefit of a presumption, of misconduct in his or her particular case. That is precisely what this defendant received: a trial in which his defense focused on impeaching the reliability of the drug evidence presented by the Commonwealth.

We conclude, on this record, that the defendant did not demonstrate a sufficient nexus between governmental misconduct and his conviction to require reversal. See Scott, 467 Mass. at 350-351. See also Monteagudo, supra at 486. He asserts that the fact that the misconduct occurred during the time his samples were initially tested at the lab is alone sufficient to

provide the required nexus.  However, the samples in this case were also subject to testing by another chemist, Della Saunders, who testified at the defendant's trial.[4]  The jury were entitled to rely on the physical evidence and testimony presented by Saunders, and to find that the defendant possessed illegal drugs when he was arrested.

2.  Additional arguments.  The defendant's remaining arguments may be characterized as variations on a theme.  He asserts that Dookhan's misconduct requires reversal of his convictions because the Commonwealth cannot establish a chain of custody, because her actions rendered the evidence insufficient, and because the circumstances here are tantamount to a loss of

---

[4] As detailed in Scott, 467 Mass. at 339-341, and at the trial of this defendant, there is no evidence that Dookhan's misconduct included mixing samples seized from different suspects, notwithstanding the defendant's assertions to the contrary at trial and on appeal.  Testimony at trial revealed that Dookhan, acting as the primary, i.e., the initial testing chemist, would draw individual samples from different cases when she believed them to be the same substance.  She would conduct the required testing on a handful of these samples, and then attribute the results to all of those she had drawn ("dry labbing").  She would then prepare small vials (aliquots) from each case for secondary testing.  In some cases, when her surmise -- that each of the untested samples was identical to the others -- proved to be wrong after a secondary chemist tested the aliquots, she would add a known substance to a new aliquot to ensure that a subsequent retest would "turn[] negative samples into positive samples," id. at 339, and confirm her report. There was no testimony that the drugs from which samples were originally drawn were ever adulterated or combined. Without that showing, the subsequent testing by Della Saunders of the drugs seized from the defendant in this case provided admissible evidence on which a fact finder could rely.

evidence. Each of these legal theories relies on the same factual misapprehension, i.e., an apparent misunderstanding of Dookhan's practices.

a. Sufficiency of the evidence. The defendant asserts that Dookhan's misconduct made it impossible for the Commonwealth to prove beyond a reasonable doubt that the substances seized from the defendant were heroin. He claims that Dookhan's conduct prevented the Commonwealth from meeting its burden to show that Saunders tested unadulterated substances. As stated, the defendant was provided with ample opportunity to challenge Saunders's results, but there was no evidence that Dookhan adulterated the original sample. At trial Saunders identified the substances as heroin and cocaine and testified further that the weights of the substances she tested in the defendant's case were consistent with a "retest." Viewed in the light most favorable to the Commonwealth, Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), the evidence of drug composition was sufficient to support the defendant's conviction beyond a reasonable doubt.

b. Chain of custody. The defendant asserts that because the Commonwealth could only identify the markings on the sample bags but could not distinguish the contents of one sample bag from another, the substances in the bags were not properly authenticated as those that were seized. However, as detailed

above, there was no evidence presented at trial that Dookhan
mixed substances from different suspects or that she adulterated
anything other than samples after they were extracted from the
substances seized from suspects.  The chain of custody of the
substances on which Saunders's subsequent testing was conducted
was properly entered in evidence at trial.[5]  The jury properly
could conclude that there was no break in the chain of custody.
Any argument regarding Dookhan's misconduct presented by the
defendant in order to establish "arguable weaknesses in the
chain of custody" goes to the weight, not admissibility, of the
drug evidence.  Commonwealth v. Colon, 33 Mass. App. Ct. 304,
309 (1992).  See Commonwealth v. Penta, 423 Mass. 546, 556
(1996).

---

[5] The officers who handled the substances seized from the
defendant testified as to their role in the chain of custody.
That testimony indicated that when the officers recovered any
substance, they turned it over to the evidence officer for the
operation, who placed the evidence in a sealed bag, marked it
with the incident date, report number, his initials, and a
notation indicating where the substances were found.  The
evidence officer then placed each of those separate sealed bags
in a larger envelope, which was marked with the officer's name,
the defendant's name, and the incident number.  That envelope
was then placed in the evidence safe at the police station. From
there, the envelope was transported to the drug lab for testing
and returned to the evidence safe when testing was completed.
The evidence stayed in that safe until the drugs were
transported to the lab again for subsequent testing by Della
Saunders.  Once tested, the evidence was again returned to the
evidence safe at the police station until the investigating
officers transported it to court for trial.  At trial, each
person in the chain of custody was able to identify the unique
markings on the packages to identify the substances as those
seized from the defendant.

c.  _Lost evidence_.  The defendant contends that as a result of Dookhan's misconduct the Commonwealth lost exculpatory evidence and therefore his convictions should be reversed and the indictments dismissed.  To succeed on a claim of lost evidence the defendant must demonstrate that the Commonwealth lost evidence in the first instance.  The defendant's argument in this respect again relies on the assumption that the substances tested by Saunders were previously adulterated by Dookhan.  Otherwise stated, the defendant asserts that none of the substances seized from him remained unaltered, and hence the evidence must be deemed "lost."  As stated, there is no evidence to support this assertion; the evidence presented at trial indicates the opposite.  Saunders testified that the weights of the substances she tested were consistent with a retest of the original amount seized, and there was no evidence that the substances were ever adulterated or mixed together.  The defendant, therefore, has failed to make the threshold showing that the Commonwealth lost any evidence in this case.[6]

---

[6] Even if the defendant had shown that evidence were lost, he would be required to demonstrate "based on concrete evidence, rather than a fertile imagination," that what was lost (or, in this case, adulterated) would otherwise have been exculpatory.  Commonwealth v. Sanford, 460 Mass. 441, 447 (2011).  The controlled purchase by an undercover officer combined with the circumstances of his arrest would have made this showing difficult.  He nevertheless might have prevailed on his lost evidence claim with a showing that the Commonwealth acted "in bad faith or recklessly."  Id. at 450, citing Commonwealth v.

   3.  Jury instructions.  The defendant asserts that the "suit coat" example[7] of constructive possession in the jury instructions was too similar to the facts in this case and expressed approval for the Commonwealth's theory of the case.[8] The defendant objected to that portion of the instruction but declined the judge's offer to give a curative instruction.  Jury instructions are to be reviewed in their entirety.  Commonwealth v. Walker, 466 Mass. 268, 284 (2013).  Isolating the example from the remainder of the charge ignores that the judge also instructed that the defendant had to knowingly possess the drugs in the pants pocket in order for the jury to find him guilty of possession.  See Commonwealth v. Gil, 393 Mass. 204, 221-222

_____

Williams, 455 Mass. 706, 718 (2010).  While Dookhan's actions, and the circumstances in the Hinton drug lab that allowed them, certainly meet this description, the Commonwealth mitigated its culpability with full disclosure and a retest of the originally seized drugs.

   [7] The challenged instruction is as follows:

   "In my lobby, my office over to my right, I have my suit coat. And I know that when I came into work this morning, I drove a car and I have my car keys in my suit coat pocket. I'm not wearing my suit coat pocket, but I know where it is, I know the keys are there.  I have the ability and the intention to exercise control over those keys, really, essentially, whenever I want to.  So the law would say I have constructive possession of the car keys, which are presently in my coat pocket, hanging in my lobby."

   [8] The judge gave two examples in his charge to the jury on constructive possession, the "suit coat" example and another about items in a safety deposit box in a bank.  The defendant asserts error only as to the suit coat example.

(1984). Insofar as the defendant asserts that the instruction allowed the jury to convict the defendant based on the presence of the drugs in his pockets alone, the instruction that the Commonwealth had to prove the defendant knowingly possessed a controlled substance eliminates any confusion, as did the example itself, which required that the judge know the keys were in his pocket in order to be in possession of them. Further, the judge instructed the jury later in his charge that he was neutral and they should not infer that anything he said or did during the trial suggested "that [he had] an opinion on how [the jury] should decide the case." Finally, even if the instruction may have been similar to the facts of the case, it is clear that the jury were not persuaded by that similarity, given that they acquitted the defendant of possession of the cocaine found in his pants pocket. There was no error.

<u>Judgments affirmed</u>.